# United States Court of Appeals
## For the Eighth Circuit
_____

No. 17-3352
_____

Telescope Media Group, a Minnesota corporation; Carl Larsen; Angel Larsen, the founders and owners of Telescope Media Group

*Plaintiffs - Appellants*

v.

Rebecca Lucero, in her official capacity as Commissioner of the Minnesota Department of Human Rights; Keith Ellison, in his official capacity as Attorney General of Minnesota

*Defendants - Appellees*
_____

Foundation for Moral Law; Center for Constitutional Jurisprudence; Sherif Girgis; Cato Institute; 11 Legal Scholars; Ryan T. Anderson, Ph.D.; African-American and Civil Rights Leaders; State of Alabama; State of Arkansas; State of Kansas; State of Louisiana; State of Missouri; State of Nebraska; State of Oklahoma; State of South Carolina; State of Texas; State of West Virginia

*Amici on Behalf of Appellants*

American Civil Liberties Union; American Civil Liberties Union of Minnesota; District of Columbia; State of California; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; State of Iowa; State of Maine; State of Maryland; State of Massachusetts; State of New Jersey; State of New Mexico; State of New York; State of Oregon; State of Pennsylvania; State of Rhode Island; State of Vermont; State of Virginia; State of Washington; Americans United For Separation of Church and State; Anti-Defamation League; Bend the Arc, A Jewish Partnership for Justice; Central Conference of American Rabbis; Interfaith Alliance Foundation; Lambda Legal Defense and Education Fund; Muslim

Advocates; National Council of Jewish Women; People for the American Way
Foundation; Union for Reform Judaism; Women of Reform Judaism

*Amici on Behalf of Appellees*
_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis
_____

Submitted: October 16, 2018
Filed: August 23, 2019
_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Carl and Angel Larsen wish to make wedding videos. Can Minnesota require them to produce videos of same-sex weddings, even if the message would conflict with their own beliefs? The district court concluded that it could and dismissed the Larsens' constitutional challenge to Minnesota's antidiscrimination law. Because the First Amendment allows the Larsens to choose when to speak and what to say, we reverse the dismissal of two of their claims and remand with instructions to consider whether they are entitled to a preliminary injunction.

I.

The Larsens, who own and operate Telescope Media Group, use their "unique skill[s] to identify and tell compelling stories through video," including commercials, short films, and live-event productions. They exercise creative control over the videos they produce and make "editorial judgments" about "what events to

-2-

take on, what video content to use, what audio content to use, what text to use . . . , the order in which to present content, [and] whether to use voiceovers."

The Larsens "gladly work with all people—regardless of their race, sexual orientation, sex, religious beliefs, or any other classification." But because they "are Christians who believe that God has called them to use their talents and their company to . . . honor God," the Larsens decline any requests for their services that conflict with their religious beliefs. This includes any that, in their view, "contradict biblical truth; promote sexual immorality; support the destruction of unborn children; promote racism or racial division; incite violence; degrade women; or promote any conception of marriage other than as a lifelong institution between one man and one woman."

The Larsens now wish to make films that promote their view of marriage as a "sacrificial covenant between one man and one woman." To do so, they want to begin producing wedding videos, but only of opposite-sex weddings. According to the Larsens, these videos will "capture the background stories of the couples' love leading to commitment, the [couples'] joy[,] . . . the sacredness of their sacrificial vows at the altar, and even the following chapters of the couples' lives." The Larsens believe that the videos, which they intend to post and share online, will allow them to reach "a broader audience to achieve maximum cultural impact" and "affect the cultural narrative regarding marriage."

Minnesota has a different idea.[1] Relying on two provisions of the Minnesota Human Rights Act ("MHRA"), it claims that a decision to produce *any* wedding

_____

[1]We use the term "Minnesota" to refer collectively to the Commissioner of the Minnesota Department of Human Rights and the Attorney General of Minnesota, who are the named defendants in this case. *See generally Ex parte Young*, 209 U.S. 123 (1908). The district court ruled, over the Attorney General's objection, that the Attorney General had enough of a connection to the enforcement of the Minnesota

videos requires the Larsens to make them for everyone, regardless of the Larsens' beliefs and the message they wish to convey. The first provision states:

> It is an unfair discriminatory practice . . . to deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of . . . sexual orientation.

Minn. Stat. § 363A.11, subdiv. 1(a)(1). The second provides:

> It is an unfair discriminatory practice for a person engaged in a trade or business or in the provision of a service . . . to intentionally refuse to do business with, to refuse to contract with, or to discriminate in the basic terms, conditions, or performance of the contract because of a person's . . . sexual orientation . . . , unless the alleged refusal or discrimination is because of a legitimate business purpose.

*Id.* § 363A.17(3).

Minnesota reads these two provisions as requiring the Larsens to produce both opposite-sex- and same-sex-wedding videos, or none at all. According to Minnesota, the Larsens' duty does not end there. If the Larsens enter the wedding-video business, their videos must depict same- and opposite-sex weddings in an equally "positive" light. Oral Argument at 26:08–27:15. If they do not, Minnesota has made clear that the Larsens will have unlawfully discriminated against prospective customers "because of" their sexual orientation.

---

Human Rights Act that the Larsens could seek an injunction against him. We agree that the connection here is "strong enough" to make the Attorney General a "proper defendant." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632–33 (8th Cir. 2011) (applying *Ex Parte Young*, 209 U.S. 123).

-4-

The Larsens have sued Minnesota in federal district court seeking injunctive relief preventing Minnesota from enforcing the MHRA against them. Their principal theory is that it is unconstitutional under the Free Speech Clause of the First Amendment to require them to make same-sex-wedding videos. They also raise free-exercise, associational-freedom, equal-protection, and unconstitutional-conditions claims, as well as an argument that the MHRA is unconstitutionally vague.

At this juncture, all that is before us are the allegations of the Larsens' complaint. Early on, the district court granted Minnesota's motion to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). It also denied the Larsens' request for a preliminary injunction, but only because it had already decided to dismiss their lawsuit. According to the court, the Larsens' free-speech claim failed as a matter of law because the MHRA serves an important governmental interest—preventing discrimination—without limiting more speech than necessary to accomplish this goal. It also ruled that the MHRA did not violate any of the other constitutional rights identified by the Larsens.

II.

Before addressing the merits, we must determine whether the Larsens have standing. At this stage, we assume the allegations in the complaint are true and view them in the light most favorable to the Larsens. *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 933 n.4 (8th Cir. 2012).

To have standing, the Larsens must establish (1) an injury in fact; (2) a causal connection between the injury and the challenged law; and (3) that a favorable decision is likely to redress their injury. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). There is no doubt that the Larsens' allegations satisfy the second and third requirements: any injury would be traceable to the MHRA and would be

redressed by a judicial decision enjoining Minnesota from enforcing the law against them. The only real question is whether the Larsens have suffered an injury in fact.

Although a harm must be "actual or imminent, not conjectural or hypothetical," to constitute an injury in fact, *id.* at 1548 (citation omitted), a plaintiff need not wait for an actual prosecution or enforcement action before challenging a law's constitutionality, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014). In fact, all a plaintiff must do at the motion-to-dismiss stage is allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Id.* at 159 (citation omitted); *see also 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (explaining that even "[s]elf-censorship can . . . constitute injury in fact" for a free-speech claim when a plaintiff reasonably decides "to chill his speech in light of the challenged statute").

The Larsens' constitutional claims meet this test. The Free Speech Clause of the First Amendment covers films, *see Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952), so the videos the Larsens intend to make are "affected with a constitutional interest," *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted). The Larsens' desire "to engage in a course of conduct" that includes the production of videos means that their other claims are affected with a constitutional interest too, regardless of the precise legal theory. *Id.* (citation omitted).

Moreover, the Larsens have adequately alleged a "credible threat of enforcement." *Id.*; *cf.* Minn. Stat. § 363A.30, subdiv. 4 (establishing criminal penalties for certain violations). If the Larsens enter the wedding-video business and refuse to film same-sex weddings, Minnesota has made clear that it will view their actions as a violation of the MHRA. Indeed, Minnesota has publicly announced that the MHRA requires all private businesses, including photographers, to provide equal services for same- and opposite-sex weddings. It has even employed "testers" to target noncompliant businesses, and it has already pursued a successful enforcement

action against a wedding vendor who refused to rent a venue for a same-sex wedding. Minnesota's active enforcement of the MHRA leaves us with little doubt that the Larsens will face legal consequences if they decide to start making wedding videos.[2]

## III.

Having determined that the Larsens have standing, we now address their principal claim, which is that the wedding videos are speech and they have a First Amendment right to make them for only opposite-sex weddings. At this stage, our task is to review the complaint de novo to determine whether it alleges one or more actionable claims. *United States ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012).

## A.

The First Amendment, which applies to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. It promotes the free exchange of ideas by allowing people to speak in many forms and convey a variety of messages, including those that "invite dispute" and are "provocative and challenging." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). It also prevents the government from "[c]ompelling individuals to mouth support for views they find objectionable." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). As the Supreme Court has

---

[2]Treating it as an independent claim, the district court separately concluded that the Larsens lacked standing to argue that the MHRA may eventually require them to post all of their wedding videos online, not just the ones that are consistent with their views on marriage. Our take is different. This allegation is simply an example of one of the harms that the Larsens may eventually suffer if they are required to make both opposite-sex- and same-sex-wedding videos. Developing individual allegations like this one will be a part of proving the Larsens' First Amendment claim.

made clear, "[t]here is no room under our Constitution for a more restrictive" approach because "the alternative would lead to standardization of ideas . . . by legislatures, courts, or dominant political or community groups." *Terminiello*, 337 U.S. at 4–5.

The Larsens' videos are a form of speech that is entitled to First Amendment protection. The Supreme Court long ago recognized that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Joseph Burstyn*, 343 U.S. at 502; *see also Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65–66 (1981). Indeed, "[i]t cannot be doubted that motion pictures are a significant medium for the communication of ideas." *Joseph Burstyn*, 343 U.S. at 501. "They [can] affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Id.*

Although the Larsens do not plan to make feature films, the videos they do wish to produce will convey a message designed to "affect public attitudes and behavior." *Id.* According to their complaint, they will tell "healthy stories of sacrificial love and commitment between a man and a woman," depict marriage as a divinely ordained covenant, and oppose the "current cultural narratives about marriage with which [the Larsens] disagree." By design, they will serve as a "medium for the communication of ideas" about marriage. *Id.*; *cf. Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("[R]eligious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression."). And like the creators of other types of films, such as full-length documentaries, the Larsens will exercise substantial "editorial control and judgment," *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), including making decisions about the footage and dialogue to include, the order in which to present content, and whether to set parts of the film to music. The videos themselves are, in a word, speech.

The dissent reaches the opposite conclusion, but only by recasting or ignoring the allegations in the Larsens' complaint,[3] which at this stage we must accept as true. *See Miller*, 688 F.3d at 933 n.4. The complaint makes clear that the Larsens' videos will not just be simple recordings, the product of planting a video camera at the end of the aisle and pressing record. Rather, they intend to shoot, assemble, and edit the videos with the goal of expressing their own views about the sanctity of marriage. Even if their customers have some say over the finished product, the complaint itself is clear that the Larsens retain ultimate editorial judgment and control.

It also does not make any difference that the Larsens are expressing their views through a for-profit enterprise. *See post* at 48. In fact, in holding that motion pictures are protected by the First Amendment, the Supreme Court explicitly rejected the idea that films do not "fall within the First Amendment's aegis [simply] because" they are often produced by "large-scale business[es] conducted for private profit." *Joseph Burstyn*, 343 U.S. at 501; *see also Masterpiece Cakeshop*, 138 S. Ct. at 1745 (Thomas, J., concurring) ("[T]his Court has repeatedly rejected the notion that a speaker's profit motive gives the government a freer hand in compelling speech."). Other commercial and corporate entities, including utility companies and newspapers, have received First Amendment protection too. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (plurality opinion) (collecting cases); *Tornillo*, 418 U.S. at 258; *see also Citizens United v. FEC*, 558

---

[3]The dissent is a moving target. At certain points, it seems to assume that the Larsens' speech is protected, at least in some form. *See post* at 43; *United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First amendment freedoms."). At others, the dissent suggests that the videos are not speech at all, primarily because the Larsens are telling someone else's story as part of a for-profit service. *See post* at 48-49. The dissent's scattershot approach may be due to the fact that neither of these theories (or any of its others) finds support in Supreme Court precedent or opinions of this court.

U.S. 310, 342 (2010) (collecting cases). The reason, the Court has said, is that they "contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster" no less than individuals do. *Pac. Gas*, 475 U.S. at 8 (plurality opinion) (internal quotation marks and citation omitted).

Minnesota's position is that it is regulating the Larsens' conduct, not their speech. To be sure, producing a video requires several actions that, individually, might be mere conduct: positioning a camera, setting up microphones, and clicking and dragging files on a computer screen. But what matters for our analysis is that these activities come together to produce finished videos that are "medi[a] for the communication of ideas." *Joseph Burstyn*, 343 U.S. at 501; *see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference.").

If we were to accept Minnesota's invitation to evaluate each of the Larsens' acts individually, then wide swaths of protected speech would be subject to regulation by the government. The government could argue, for example, that painting is not speech because it involves the physical movements of a brush. Or it could claim that publishing a newspaper is conduct because it depends on the mechanical operation of a printing press. It could even declare that a parade is conduct because it involves walking. Yet there is no question that the government cannot compel an artist to paint, demand that the editors of a newspaper publish a response piece, or require the organizers of a parade to allow everyone to participate. *See, e.g.*, *Tornillo*, 418 U.S. at 256–58; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 572–73 (1995). Speech is not conduct just because the government says it is.

B.

Minnesota's interpretation of the MHRA interferes with the Larsens' speech in two overlapping ways. First, it compels the Larsens to speak favorably about

-10-

same-sex marriage if they choose to speak favorably about opposite-sex marriage. Second, it operates as a content-based regulation of their speech.

The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus*, 138 S. Ct. at 2463 (internal quotation marks and citation omitted). As *Janus* recognized, the latter is perhaps the more sacred of the two rights. *See id.* at 2463–64. After all, the "choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 654 (2000) (citation omitted).

To apply the MHRA to the Larsens in the manner Minnesota threatens is at odds with the "cardinal constitutional command" against compelled speech. *Janus*, 138 S. Ct. at 2463. The Larsens do not want to make videos celebrating same-sex marriage, which they find objectionable. Instead, they wish to actively promote opposite-sex weddings through their videos, which at a minimum will convey a different message than the videos the MHRA would require them to make. Even if the Larsens' desire to selectively speak is "provocative" and "stirs people to anger," *Terminiello*, 337 U.S. at 4, Minnesota cannot "coerce[ them] into betraying their convictions" and promoting "ideas they find objectionable," *Janus*, 138 S. Ct. at 2464. Compelling speech in this manner, as the Supreme Court made clear in *Janus*, "is always demeaning." *Id.* This is especially true here, because Minnesota insists that the Larsens *must* be willing to convey the same "positive" message in their videos about same-sex marriage as they do for opposite-sex marriage.

Minnesota attempts to downplay this injury by pointing out that the MHRA would not require the Larsens to convey any specific message in their videos. Even if the Larsens must be willing to produce "positive" videos about same-sex marriage, Minnesota argues, they need not actually do so unless a customer requests a film with this point of view.

-11-

Even aside from its implausibility—for it seems unlikely that any same-sex couple would request a video condemning their marriage—this argument does not get Minnesota far under First Amendment doctrine. The Supreme Court has recognized that the government still compels speech when it passes a law that has the effect of foisting a third party's message on a speaker. In *Hurley*, for example, it held that Massachusetts could not use its public-accommodation law to require the sponsors of a private parade to include a group of gay, lesbian, and bisexual individuals who wished to march while "carrying [their] own banner." 515 U.S. at 572–73. The Court explained that compelling the inclusion of others impermissibly "declar[ed] the sponsors' speech itself to be [a] public accommodation" in a way that "alter[ed] the expressive content of their parade." *Id.*

Similarly, in *Tornillo*, the Supreme Court addressed a Florida statute that required newspapers that published attacks on the "personal character or official record" of political candidates to publish the candidates' responses too, free of cost. 418 U.S. at 244. Forced inclusion, the Court reasoned, "fail[ed] to clear the barriers of the First Amendment" because it impermissibly "intru[ded] into the function of the editors." *Id.* at 258. The lesson from *Tornillo* is that the First Amendment is relevant whenever the government compels speech, regardless of who writes the script.

The MHRA also operates in this case as a content-based regulation of the Larsens' speech, even if, as the Supreme Court has recognized, the MHRA does not, "[o]n its face, . . . aim at the suppression of speech." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). A content-based regulation "[m]andat[es] speech that a speaker would not otherwise make" or "exacts a penalty on the basis of the content of" speech. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (quoting *Tornillo*, 418 U.S. at 256). By treating the Larsens' choice to talk about one topic—opposite-sex marriages—as a trigger for compelling them to talk about a topic they would rather avoid—same-sex marriages—the MHRA does both at once. In fact, by requiring the Larsens to convey "positive" messages about same-

-12-

sex weddings, it even goes a step further. *Cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (describing content-based regulations as those that operate based on "the topic discussed or the idea or message expressed").

The Supreme Court's decision in *Tornillo* highlights the problems with content-based regulations. Even if a regulation that requires speech does not directly "prevent[ speakers] from saying anything [they] wish[]," it still exacts a penalty. *Tornillo*, 418 U.S. at 256 (citation omitted). In *Tornillo*, the penalty threatened to drive "editors [to] conclude that the safe course [was] to avoid controversy" and to simply not "publish[] news or commentary arguably within the reach of the . . . statute." *Id.* at 257. Here, "the safe course" for the Larsens would be to avoid the wedding-video business altogether. Yet this type of compelled self-censorship, a byproduct of regulating speech based on its content, unquestionably "dampens the vigor and limits the variety of public debate."[4] *Id.* (citation omitted).

## C.

Laws that compel speech or regulate it based on its content are subject to strict scrutiny, which will require Minnesota, at a minimum, to prove that the application of the MHRA to the Larsens is "narrowly tailored to serve [a] compelling state interest[]." *Reed*, 135 S. Ct. at 2226; *see also, e.g.*, *Dale*, 530 U.S. at 654 ("[T]he choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control." (citation omitted)); *Hurley*, 515 U.S. at 573 ("[T]he fundamental rule of protection under the First Amendment[ is] that a speaker has the autonomy to choose the content of his own message."); *cf. Janus*,

---

[4]The allegations here may well be more troubling from a First Amendment perspective than the facts of *Tornillo*. In that case, all the newspaper had to do was reproduce verbatim an opinion piece written by someone else. *See Tornillo*, 418 U.S. at 244. The MHRA, in contrast, would require the Larsens to use their own creative skills to speak in a way they find morally objectionable.

-13-

138 S. Ct. at 2464 (suggesting that "a law commanding 'involuntary affirmation' of objected-to beliefs would require '*even more* immediate and urgent grounds' than a law demanding silence" (emphasis added) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943))); *Gralike v. Cook*, 191 F.3d 911, 919–20 (8th Cir. 1999) (applying strict scrutiny to a law forcing candidates to speak about term limits). In an as-applied challenge like this one, the focus of the strict-scrutiny test is on the actual speech being regulated, rather than how the law might affect others who are not before the court. *See Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017).

1.

The State asserts an interest in ensuring "that all people in Minnesota [are] entitled to full and equal enjoyment of public accommodations and services." (internal quotation marks and citation omitted). This interest has a substantial constitutional pedigree and, generally speaking, we have no doubt that it is compelling. For example, the Supreme Court has said that antidiscrimination laws typically "are well within the State's . . . power to enact when a legislature has reason to believe that a given group is the target of discrimination." *Hurley*, 515 U.S. at 572. Indeed, the MHRA itself withstood a constitutional challenge after Minnesota applied it to compel a "large and basically unselective" social club to accept female members. *Roberts*, 468 U.S. at 621–22, 626–27. And like the dissent, we have little doubt that Minnesota had powerful reasons for extending the MHRA to protect its citizens against sexual-orientation discrimination. *See post* at 31-32.

But that is not the point. Even antidiscrimination laws, as critically important as they are, must yield to the Constitution. And as compelling as the interest in preventing discriminatory conduct may be, speech is treated differently under the First Amendment. *See Hurley*, 515 U.S. at 579 ("While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a

disfavored one, however enlightened either purpose may strike the government."). As the Supreme Court has explained, even if the government may prohibit "the *act* of discriminating against individuals in the provision of publicly available goods, privileges, and services," it may not "declar[e] [another's] speech itself to be [a] public accommodation" or grant "protected individuals . . . the right to participate in [another's] speech." *Id.* at 572–73 (emphasis added).

*Hurley* is particularly instructive. When Massachusetts forced the organizers of a private parade to include a group that wished "to march in the parade as a way to express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals," *id.* at 560–61, the Supreme Court concluded that applying the State's public-accommodation law in this way violated the organizers' freedom of speech, *id.* at 566. Although antidiscrimination laws are generally constitutional, the Court reasoned, a "peculiar" application that required speakers "to alter the[ir] *expressive content*" was not. *Id.* at 572–73 (emphasis added). In short, the Court drew the line exactly where the Larsens ask us to here: to prevent the government from requiring their speech to serve as a public accommodation for others.

Similarly, in *Dale*, the Supreme Court held that the Boy Scouts had the right to expel a gay-rights activist, despite a New Jersey antidiscrimination law that otherwise prohibited the action. 530 U.S. at 644. The reason, the Court said, was that the Boy Scouts' opposition to homosexuality was expressive and "the forced inclusion of [the activist] would [have] significantly affect[ed] its expression." *Id.* at 650–52, 656; *see also id.* at 659 ("[T]he First Amendment prohibits the State from imposing [an inclusion] requirement through the application of its public accommodations law."). Like *Hurley*, *Dale* makes clear that once conduct crosses over to speech or other expression, the government's ability to regulate it is limited.

As these cases demonstrate, regulating speech because it is discriminatory or offensive is not a compelling state interest, however hurtful the speech may be. It is a "bedrock principle . . . that the government may not prohibit the expression of an

-15-

idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also Masterpiece Cakeshop*, 138 S. Ct. at 1731 ("[I]t is not . . . the role of the State or its officials to prescribe what shall be offensive."). After all, the Westboro Baptist Church could carry highly inflammatory signs at military funerals, *see Snyder v. Phelps*, 562 U.S. 443, 448–49, 460–61 (2011), the Nazis could march in areas heavily populated by Jewish residents, *see Nat'l Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43, 43–44 (1977) (per curiam), and an activist could burn the American flag as a form of political protest, *see Johnson*, 491 U.S. at 399.

The cases relied upon by Minnesota and the dissent are not to the contrary. In *Roberts*, for example, the Supreme Court emphasized that an all-male social club had failed to show that a law requiring the admission of female members "impose[d] any serious burdens on the male members' freedom of expressive association" or "impede[d] the organization's ability to engage in . . . protected activities or to disseminate its preferred views." 468 U.S. at 626–27; *see also id.* at 627 (highlighting that the law "impose[d] no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members"). So too in *Hishon v. King & Spalding*, in which the Court emphasized that a law firm "ha[d] not shown how its ability to [exercise its expressive and associational rights] would be inhibited by a requirement that it consider [a woman] for partnership on her merits." 467 U.S. 69, 78 (1984). The unmistakable message is that antidiscrimination laws can regulate conduct, but not expression.

Indeed, if Minnesota were correct, there is no reason it would have to stop with the Larsens. In theory, it could use the MHRA to require a Muslim tattoo artist to inscribe "My religion is the only true religion" on the body of a Christian if he or she would do the same for a fellow Muslim, or it could demand that an atheist musician perform at an evangelical church service. In fact, if Minnesota were to do what other jurisdictions have done and declare political affiliation or ideology to be

a protected characteristic, then it could force a Democratic speechwriter to provide the same services to a Republican, or it could require a professional entertainer to perform at rallies for both the Republican and Democratic candidates for the same office. *See, e.g.*, D.C. Code § 2-1402.31; Seattle, Wash., Mun. Code §§ 14.06.010, .020(L), 030(B); *cf. Hurley*, 515 U.S. at 571–72 (recognizing that states have the power to create additional protected classes).

2.

Even so, Minnesota argues that we should apply intermediate scrutiny based on a theory that, once again, turns on the distinction between conduct and speech. Specifically, when "'speech' and 'nonspeech' elements are combined in the same course of conduct" and the government seeks to neutrally regulate the non-speech element, intermediate scrutiny applies under the incidental-burden doctrine. *Johnson*, 491 U.S. at 407 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 26–27 (2010) (explaining that a regulation must be content-neutral under this doctrine). According to Minnesota, the MHRA only incidentally burdens speech because it neutrally regulates "commercial conduct and economic activity" and requires the Larsens to do nothing more than provide "services to customers regardless of their sexual orientation."

The problem with this theory, even aside from the fact that the MHRA is not content neutral, *see supra* Part III.B, is that Minnesota does not actually seek to regulate non-speech activity, *see Humanitarian Law Project*, 561 U.S. at 26–27. The "commercial conduct" and "economic activity" to which Minnesota refers is the making of the videos themselves, which, as we have already explained, are speech. Indeed, Minnesota cannot specifically identify *anything* else, meaning that this is just a repackaging of its theory that making the videos is conduct, not speech. *See supra* Part III.A.

-17-

Importantly, the fact that Minnesota is not shy about its belief that it can regulate the videos themselves distinguishes this case from other applications of antidiscrimination laws that actually *do* target conduct, which are generally constitutional even when they incidentally affect speech. *Cf. Hurley*, 515 U.S. at 572–73 (declaring a "peculiar" application of an antidiscrimination law to be unconstitutional). An employment-discrimination law, for example, can unquestionably "require an employer to take down a sign reading 'White Applicants Only.'" *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* (*F.A.I.R.*), 547 U.S. 47, 62 (2006). And a public-accommodation law requiring a restaurant to serve people of all races, genders, and sexual orientations will have the incidental effect of requiring servers to speak to customers to take their orders. But these consequences are incidental because the relevant laws target the *activities* of hiring employees and providing food, neither of which typically constitutes speech. Here, by contrast, Minnesota is targeting speech itself.[5]

Minnesota also suggests that a lesser form of scrutiny is appropriate because the Larsens can say that they disapprove of same-sex marriage in some other way. But just like New Hampshire could not "require [drivers] to display the state motto" Live Free or Die on their license plates, *Wooley v. Maynard*, 430 U.S. 705, 717 (1977), even if they could disavow the motto through "a conspicuous bumper

---

[5]In fact, Minnesota's position intrudes on the Larsens' speech in yet another way. In its view, the MHRA would not allow the Larsens to even advertise what they have in mind for their wedding videos. The district court upheld this limitation on the theory that "telling potential customers that a business will discriminate . . . is part of the act of . . . discrimination itself."

This analysis, however, rests on a faulty premise. If creating videos were conduct that Minnesota could regulate, then the State could invoke the incidental-burden doctrine to forbid the Larsens from advertising their intent to engage in discriminatory conduct. *See F.A.I.R.*, 547 U.S. at 62. But in this case, Minnesota cannot compel the Larsens to speak, so it cannot force them to remain silent either. *See Wooley*, 430 U.S. at 714.

-18-

sticker," *id.* at 722 (Rehnquist, J., dissenting), so too would a disclaimer here be inadequate. The reason is that the constitutional "protection of a speaker's freedom would be empty" if "the government could require speakers to affirm in one breath that which they deny in the next." *Hurley*, 515 U.S. at 576 (brackets and citation omitted).

To be sure, the Supreme Court has suggested that the opportunity to provide a disclaimer can make a difference when a law requires an otherwise-silent party to provide a forum for the speech of others. One example is *PruneYard Shopping Center v. Robins*, which upheld a requirement compelling the owner of a shopping mall to allow private individuals to distribute political pamphlets on the premises. 447 U.S. 74, 77–78, 88 (1980). The Court emphasized that the owner could "expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers st[ood]." *Id.* at 87. "Notably absent," however, "was any concern that access to [the mall] might affect the shopping center owner's exercise of his own right to speak" or any allegation that the owner "objected to the content of the pamphlets." *Pac. Gas*, 475 U.S. at 12 (plurality opinion). Here, of course, the Larsens strenuously object to what Minnesota would have them say.

Minnesota's reliance on *F.A.I.R.* is similarly flawed. *F.A.I.R.* was also about the availability of a forum, but this time for legal recruiters. Law schools, which invited and hosted recruiters of all types, objected to hosting the military because of a disagreement with policies that excluded gays and lesbians from serving. *F.A.I.R.*, 547 U.S. at 51–52. Federal law, however, required the schools to give equal access to military recruiters or risk losing federal funding. *Id.* The schools sued, claiming that they had a First Amendment right to exclude military recruiters from campus. *Id.* at 52–53. The Supreme Court disagreed, even if the schools had to "send e-mails [and] post notices on bulletin boards on [the recruiters'] behalf"—both "elements of speech." *Id.* at 61.

The Supreme Court upheld the law because it did not interfere with the law schools' expression or coopt their speech. Simply hosting recruiters was not speech, according to the Court, so the "accommodation of a military recruiter's message" did not "sufficiently interfere with any message of the school[s]." *Id.* at 64. Besides, just like the mall owner in *PruneYard*, the schools "remain[ed] free . . . to express whatever views they may have [had] on the military's congressionally mandated employment policy." *Id.* at 60. Cases like *Hurley*, by contrast, involved unconstitutionally compelled speech because "the complaining speaker's own message was affected by the speech it was forced to accommodate." *Id.* at 63.

The facts of the case, as pleaded by the Larsens, are much closer to *Hurley* than to *PruneYard* or *F.A.I.R.* Rather than serving as a forum for the speech of others, the Larsens' videos will carry their "own message." *Id.* The MHRA interferes with their message by requiring them to say something they otherwise would not. *See id.* at 64. The Larsens, then, lose "the autonomy to choose the content of [their] own message," *id.* (quoting *Hurley*, 515 U.S. at 573), which violates the "cardinal constitutional command" against compelled speech, *Janus*, 138 S. Ct. at 2463.

*     *     *

Consistent with the Supreme Court's instruction that antidiscrimination laws "do not, as a general matter, violate the First . . . Amendment[]," *Hurley*, 515 U.S. at 572, our holding leaves intact other applications of the MHRA that do not regulate speech based on its content or otherwise compel an individual to speak. But when, as here, Minnesota seeks to regulate speech itself as a public accommodation, it has gone too far under *Hurley* and its interest must give way to the demands of the First Amendment.

IV.

The district court also ruled that the Larsens could not seek relief on various other constitutional theories. We largely agree that these claims fail. But one—the free-exercise claim—can proceed because it is intertwined with their free-speech claim. Accordingly, the Larsens are free to pursue their so-called "hybrid rights" claim on remand.

A.

The basic premise of the Larsens' free-exercise claim is that the MHRA, as interpreted by Minnesota, prevents them from freely exercising their religious beliefs. It does so, the Larsens say, because they will have to either show support for same-sex marriage, even though they object to it on religious grounds, or refrain from making wedding videos at all. This is not a typical free-exercise claim.

Those seeking relief under the Free Exercise Clause of the First Amendment will ordinarily argue that their religion requires them to engage in conduct that the government forbids or forbids certain conduct that the government requires. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (evaluating whether those who practice Santeria could perform animal sacrifice, the religion's "central element," even though it was illegal); *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 874 (1990) (deciding whether members of the Native American Church should be allowed to use peyote, a controlled substance, for "sacramental purposes"); *Gillette v. United States*, 401 U.S. 437, 461 (1971) (considering a claim that conscientious objectors should have been able to avoid military conscription during the Vietnam War). If the Larsens' claim fell into one of those two categories, then we would simply apply the rule that neutral, generally applicable laws that incidentally burden "a particular religious practice" do not have to be "justified by a compelling governmental interest." *Church of the Lukumi*, 508 U.S. at 531; *see also Smith*, 494 U.S. at 878–79 ("We

-21-

have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting *conduct* that the State is free to regulate." (emphasis added)).

But the Larsens have alleged that the MHRA burdens their religiously motivated *speech*, not their religious *conduct*. So their claim falls into the class of "hybrid situation[s]" in which "the Free Exercise Clause *in conjunction* with other constitutional protections, such as freedom of speech," can "bar[] application of a neutral, generally applicable law." *Smith*, 494 U.S. at 881–82 (emphasis added). Because the Larsens' free-exercise claim is "[]connected with [their] communicative activity," in other words, the Larsens may use their "Free Exercise Clause concerns" to "reinforce[]" their free-speech claim. *Id.* at 882.

Minnesota, the district court, and the dissent seem to think that we can simply ignore the hybrid-rights discussion from *Smith* because it was dicta. For two reasons, it cannot be dismissed so easily. First, we applied the hybrid-rights doctrine post-*Smith* in *Cornerstone Bible Church v. City of Hastings*, which rejected a church's stand-alone free-exercise claim but recognized that the church's other constitutional claims "breathe[d] life back into [its] 'hybrid rights' claim." 948 F.2d 464, 472–73 (8th Cir. 1991). Because this aspect of *Cornerstone Bible Church* resurrected a claim that had been left for dead by the district court, our application of the hybrid-rights theory was part of the holding because it was "essential to the judgment in that case." *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers*, 913 F.2d 544, 550 (8th Cir. 1990) (distinguishing between holdings and dicta).

Second, we do not agree with the premise that *Smith*'s analysis of the hybrid-rights doctrine was dicta. *Smith* upheld a "neutral, generally applicable law" that interfered with the sacramental use of peyote. 494 U.S. at 881–82. To reach this conclusion, however, the Supreme Court had to grapple with a long line of cases that had treated the Free Exercise Clause as a shield against laws burdening religious

practices. *See id.* (collecting cases). Rather than overrule these decisions, the Court explained that they involved "hybrid situation[s]" in which a free-exercise challenge was intertwined with another constitutional right. *Id.* at 882.

This means that *Smith* did more than simply speculate about how to treat a hybrid claim in some hypothetical future case. Rather, it described the operation of an *existing* doctrine, one that it then applied to the parties. *See id.* (highlighting that "[t]here [was] no contention that Oregon's drug law represent[ed] an attempt to regulate . . . the *communication* of religious beliefs" (emphasis added)). Although the claimants did not prevail under the hybrid-rights doctrine in *Smith*, the Court's discussion of it was far from dicta.

Of course, it is not at all clear that the hybrid-rights doctrine will make any real difference in the end. After all, the Larsen's free-speech claim already requires the application of strict scrutiny. As a practical matter, then, the fact that the videos also have religious significance may not move the needle much. But because the Larsens have adequately alleged a hybrid-rights claim in their complaint, the district court must allow them to develop it on remand. *See Cornerstone Bible Church*, 948 F.2d at 473.

B.

The Larsens cannot prevail on any of their remaining claims, beginning with their allegation that the MHRA violates their associational-freedom rights. Their theory is that the law forces them "to join together and speak with those who wish to express an opposing message about marriage," which unconstitutionally "impairs their ability to express their views, and only those views." (internal quotation marks, brackets, and citation omitted).

Although the Larsens call it associational freedom, this is really a disguised free-speech claim. The right to expressive association protects groups from being

-23-

forced "to accept members [they do] not desire." *F.A.I.R.*, 547 U.S. at 69 (citation omitted). But requiring the Larsens to produce same-sex-wedding videos would not force them to accept same-sex couples as "members" of their company or of some other group to which they belong. Rather, they would simply have to "'associate' with [same-sex couples] in the sense that they [would need to] interact with them." *Id.* Standing alone, these interactions would not affect their "ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648. It is only when these interactions require the Larsens to speak in a certain way that the MHRA "impair[s] the[ir] ability . . . to express th[eir] views." *Id.*

Indeed, the Larsens' allegations all but doom their associational-freedom claim. The complaint stresses that the Larsens will "gladly work with all people— regardless of their . . . sexual orientation"—as long as the message of any video they are asked to make fits with their religious beliefs. The Larsens' counsel reinforced this point at oral argument, explaining that they would have no problem making other types of videos for gay or lesbian customers. It is clear, then, that serving, speaking to, and otherwise associating with gay and lesbian customers is not the harm they seek to remedy. Their real objection is to the message of the videos themselves, which is just another way of saying that the MHRA violates their free-speech rights.

## C.

The Larsens have also brought a claim alleging a violation of the Equal Protection Clause of the Fourteenth Amendment. Their argument begins with the uncontroversial premise that free speech and the free exercise of religion are fundamental constitutional rights. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 570–71 (1942); *Cantwell v. Connecticut*, 310 U.S. 296, 303, 307 (1940). The MHRA treats people differently in the exercise of these fundamental rights, they say, because "[f]ilmmakers who support same-sex marriage are free to create and sell wedding films that align with their views on marriage," while those who oppose it

-24-

are not. So this "classification[] affecting fundamental rights" merits strict scrutiny—a standard that the MHRA cannot satisfy. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

The problem with the Larsens' logic lies in the middle step: the classification that they believe they have identified. The MHRA does not classify anyone based on their views about marriage. Rather, under Minnesota's interpretation, *every* wedding-video business must be willing to film both opposite-sex and same-sex weddings. The point, in other words, is that the law applies equally. *Cf. Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979) ("The Fourteenth Amendment guarantees equal laws, not equal results.").

To be sure, the Larsens, and others like them, are unhappy with the MHRA's requirements, but dissatisfaction with the law is not itself a classification. *Cf. id.* at 271–72 (explaining that "many [laws] affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law"). Indeed, by the Larsens' logic, any rule that affects religiously motivated conduct would be subject to strict scrutiny because it would create two groups of people: those who are happy to follow the law and those who are not. But we know from *Smith* that the government has the power to enact neutral, generally applicable laws that burden religious conduct. 494 U.S. at 878–80. We accordingly reject the Larsens' attempt to manufacture a legal classification that does not exist.

D.

The Larsens further allege that the MHRA "is vague and allows unbridled discretion." They focus on Minn. Stat. § 363A.17(3), which forbids discrimination "unless the alleged refusal or discrimination is because of *a legitimate business purpose*." (Emphasis added). According to the Larsens, this exception creates "uncertainty" about the scope of the law and allows Minnesota to enforce the law

-25-

however it wishes, including more aggressively against those with whom it disagrees.

The MHRA, as applied to the Larsens, is not unconstitutionally vague. "We consider whether a statute is vague as applied to *the particular facts at issue*, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian Law Project*, 561 U.S. at 18–19 (emphasis added) (internal quotation marks, brackets, and citation omitted). The allegations in the complaint once again doom the Larsens' argument, this time because they insist that "the MHRA prohibits them from [creating only opposite-sex-wedding videos]" and that Minnesota has "categorically declared" that their religious objections are not a "legitimate business purpose." So their argument that they are somehow left in legal limbo rings hollow.

They also cannot explain how the legitimate-business-purpose exception gives unbridled discretion to state officials. The Larsens fail to cite even a single example of discrimination in enforcement of this exception, much less show that Minnesota has a pattern of discriminatory enforcement. Nor is the phrase "legitimate business purpose," which mirrors language routinely used elsewhere in antidiscrimination law, *see, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (explaining that an employer may rebut a charge of discrimination by pointing to "some legitimate, nondiscriminatory reason" for a hiring decision), so open-ended "that it authorizes or encourages seriously discriminatory enforcement," *Humanitarian Law Project*, 561 U.S. at 18 (citation omitted).

E.

Finally, the Larsens' complaint also alleges a violation of the unconstitutional-conditions doctrine. They reason that the MHRA "conditions [their] right to promote their religious views about marriage . . . on their willingness to forfeit their

-26-

rights to be free from government-compelled speech, to freely exercise their religion, and to equal protection of the laws."

This argument is just a replay of their other claims, once again under an ill-fitting legal framework. The unconstitutional-conditions doctrine prevents the government from "deny[ing] a *benefit* to a person" because of "constitutionally protected [activity]." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (emphasis added). This case, however, involves "direct[]" regulation, not the withholding of benefits, such as "tax exemptions," "unemployment benefits," or "welfare payments." *Id.* (citation omitted). We accordingly treat this claim for what it is: three miscast, freestanding constitutional claims.

V.

We affirm the district court's judgment in part, reverse it in part, and remand for further proceedings. On remand, the district court must consider in the first instance whether the Larsens are entitled to a preliminary injunction, keeping in mind the principle that, "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (2012) (en banc) (citation omitted).

KELLY, Circuit Judge, concurring in part and dissenting in part.

The Larsens want to expand their videography business to provide wedding-video services, but they do not want to supply these services for same-sex weddings. Minnesota has enacted a general antidiscrimination statute that prohibits businesses from discriminating against individuals based on certain protected characteristics, including sexual orientation. The Larsens filed this lawsuit to obtain an exemption that would allow them to deny service to same-sex couples. The court today correctly rejects many of the Larsens' arguments as to why they are entitled to such

an exemption. It nonetheless concludes that the First Amendment's protections for free speech and free exercise of religion likely entitle them to relief. From this holding, I must respectfully dissent.

No court has ever afforded "affirmative constitutional protections" to private discrimination. Norwood v. Harrison, 413 U.S. 455, 469–70 (1973). Indeed, caselaw has long recognized that generally applicable laws like Minnesota's may limit the First Amendment rights of an individual in his capacity as the owner of a business serving the public. Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n, 138 S. Ct. 1719, 1723–24 (2018). Although religious and philosophical objections to same-sex marriage are protected by the First Amendment, "such objections do not allow business owners . . . to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." Id. at 1727. That well-established principle should have easily disposed of this case.

Instead, the court tries to recharacterize Minnesota's law as a content-based regulation of speech, asserting that it forces the Larsens to speak and to convey a message with which they disagree. Neither is true. The Larsens remain free to communicate any message they desire—about same-sex marriage or any other topic—or no message at all. What they cannot do is operate a public accommodation that serves customers of one sexual orientation but not others. And make no mistake, that is what today's decision affords them license to do. The Larsens concede that they want to operate a public accommodation that serves only opposite-sex couples. Minnesota's law prohibits that conduct just as it would prohibit any hotel from denying its services to an individual based on race, any store from refusing to sell goods to a person based on religion, or any restaurant from charging higher prices to women than to men. That the service the Larsens want to make available to the public is expressive does not transform Minnesota's law into a content-based regulation, nor should it empower the Larsens to discriminate against prospective customers based on sexual orientation.

-28-

I

A

The axiom that places of public accommodation are open to everyone is deeply rooted in the American legal system. Since at least the sixteenth century, the common law recognized that innkeepers and common carriers were obligated to serve all potential customers. See Lombard v. Louisiana, 373 U.S. 267, 276–77 & n.6 (1963) (Douglas, J., concurring); see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 571 (1995); Bell v. Maryland, 378 U.S. 226, 296–99 (1964) (Goldberg, J., concurring). After the Civil War, states began codifying those protections through public accommodations statutes to protect African Americans from discrimination. Hurley, 515 U.S. at 571 (discussing Massachusetts's adoption of the first public accommodations law in 1865); see also State Public Accommodation Laws, Nat'l Conf. St. Legislatures, http://www.ncsl.org/research/civil-and-criminal-justice/state-public-accommodation-laws.aspx (last updated April 8, 2019) (indicating that all but five states have such laws). The federal government followed suit with the Civil Rights Act of 1875 and later the Civil Rights Act of 1964, Title II of which contains the current requirement: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

Public accommodations laws enforce the basic and fundamental right to be treated as an equal in American society. Private discrimination "sap[s] the moral fiber of the Nation," 110 Cong. Rec. 7379 (1964) (statement of Sen. Kennedy), and "mars the atmosphere of a united and classless society in which this Nation rose to greatness," 110 Cong. Rec. 7399 (1964) (statement of Sen. Magnuson) (quoting President John F. Kennedy, Feb. 28, 1963). Title II and laws like it "send[] a clear message to . . . places of public accommodations" that they may not deny

historically disadvantaged groups the "equally effective and meaningful opportunity to benefit from all aspects of life in America." 135 Cong. Rec. 8506 (1989) (statement of Sen. Harkin) (discussing the Americans with Disabilities Act).

In that vein, Minnesota enacted the Minnesota Human Rights Act (MHRA) more than 130 years ago. The MHRA originally provided that all persons "of every race and color" shall be "entitled to the full and equal enjoyment of" public accommodations within the state. An Act To Protect All Citizens in Their Civil and Legal Rights, ch. 224, sec. 1, 1885 Minn. Laws 295, 296. Like other states, Minnesota eventually broadened the scope of the law's protections to cover a wider swath of businesses and a larger number of protected classes. See U.S. Jaycees v. McClure, 305 N.W.2d 764, 766–68 (Minn. 1981) (discussing the law's history). The current law defines a place of public accommodation as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public." Minn. Stat. § 363A.03 subdiv. 34 (2018).

The current MHRA contains two antidiscrimination provisions at issue here. The Public Accommodations Provision prohibits denying anyone the "full and equal enjoyment" of the goods or services of a place of public accommodation because of "race, color, creed, religion, disability, national origin, marital status, sexual orientation, or sex." Id. § 363A.11 subdiv. 1(a)(1). The Business Discrimination Provision makes it an "unfair discriminatory practice" for a business "to intentionally refuse to do business with, to refuse to contract with, or to discriminate in the basic terms, conditions, or performance of the contract because of a person's race, national origin, color, sex, sexual orientation, or disability, unless the alleged refusal or discrimination is because of a legitimate business purpose." Id. § 363A.17(3).

Minnesota's decision to add sexual orientation to the list of protected characteristics was driven by substantial evidence of sexual-orientation discrimination, particularly in rural areas. In April 1990, Minnesota Governor Rudy Perpich appointed a task force to determine whether gay and lesbian Minnesotans were suffering from discrimination and to make policy recommendations. See Report of the Governor's Task Force on Lesbian and Gay Minnesotans (Mar. 22, 1991) [hereinafter Task Force Report], J.A. 325–461. The task force heard forty hours of public and private testimony on a range of issues affecting gay and lesbian communities in various parts of the state. Id., J.A. 330. It concluded that there remains "substantial societal hostility" toward homosexuality, which is "damaging to gay men and lesbians and ultimately . . . society as a whole." Id. Discrimination is "wide-spread," but it is "perhaps worse" in the state's rural areas, where there is greater evidence that gays and lesbians fear losing their jobs and housing on account of sexual orientation. Id., J.A. 333. The task force noted that "an underlying theme" to all of its public hearings and briefings "was the need to add gays and lesbians as a protected class under the Minnesota Human Rights Act" to combat the "considerable discrimination" faced by those individuals. Id., J.A. 332. In particular, the task force highlighted the need to include protections for public accommodations because "[s]everal people testified that they had been denied motel or hotel rooms when the inn-keepers discovered they were gay, remarking, 'We don't want your kind here.'" Id.

This evidence is consistent with the well-documented history of discrimination against gays and lesbians in this country. "[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral." Lawrence v. Texas, 539 U.S. 558, 571 (2003). Homosexuality was treated as an illness for much of the twentieth century, and until recently, same-sex intimacy was criminalized by many states. Obergefell v. Hodges, 135 S. Ct. 2584, 2596 (2015); see also Lawrence, 539 U.S. at 578. "Gays and lesbians were prohibited from most government employment, barred from military service, excluded under immigration laws,

targeted by police, and burdened in their rights to associate." <u>Obergefell</u>, 135 S. Ct. at 2596.

It was in light of this history that Minnesota amended the MHRA to prohibit various forms of discrimination based on sexual orientation. The amendments sought to ensure that "sexual orientation cannot be used to deny some Minnesotans the basic rights to a place to live, employment and other public accommodations which should be enjoyed by all citizens." Letter from Hubert H. Humphrey III, Att'y Gen., to Hon. Alan Spear, Chair, Senate Judiciary Comm. (Mar. 1, 1993) [hereinafter Humphrey Letter], J.A. 477. As relevant here, the law added sexual orientation to the list of protected characteristics included in the Public Accommodations Provision and the Business Discrimination Provision, <u>see</u> Act of April 2, 1993, ch. 22, sec. 10, 1993 Minn. Laws 121, 131–32; <u>id.</u> sec. 15, 1993 Minn. Laws at 140, thereby recognizing that "the right to public accommodations, public services and freedom from personal harm, should be guaranteed to all," Humphrey Letter, J.A. 478.

Minnesota is not alone in making sexual orientation a protected characteristic or in prohibiting sexual-orientation discrimination in places of public accommodation. Approximately half the states in the Union, along with the District of Columbia, provide similar protections.[6] In the remaining states, more than 100

---

[6]<u>See</u> Cal. Civ. Code § 51(b) (West 2016); Colo. Rev. Stat. Ann. § 24-34-601(2)(a) (West 2014); Conn. Gen. Stat. Ann. § 46a-81d(a) (West 2012); Del. Code Ann. tit. 6, § 4504(a)(1) (West 2018); D.C. Code Ann. § 2-1402.31(a)(1) (West 2012); Haw. Rev. Stat. Ann. § 489-3 (West 2019); 775 Ill. Comp. Stat. Ann. 5/1-103(Q), 5-102(A) (West 2019); Iowa Code Ann. § 216.7(1) (West 2019); Me. Rev. Stat. Ann. tit. 5, § 4591 (2005); Md. Code Ann., State Gov't § 20-304 (West 2014); Mass. Gen. Laws Ann. ch. 272, § 98 (West 2016); Nev. Rev. Stat. Ann. § 651.070 (West 2011); N.H. Rev. Stat. Ann. § 354-A:17 (2018); N.J. Stat. Ann. § 10:5-12(f)(1) (West 2018); N.M. Stat. Ann. § 28-1-7(F) (West 2019); N.Y. Civ. Rights Law § 40-c(2) (McKinney 2019); Or. Rev. Stat. Ann. § 659A.403 (West 2016); 11

local jurisdictions have adopted laws or ordinances prohibiting discrimination on the basis of sexual orientation in places of public accommodation. See Br. of Amici Curiae Massachusetts et al. 3a–8a. In all, more than half of all Americans live in a jurisdiction that prohibits this type of discrimination. See id. at 9–10 & n.6.

Numerous religious groups supported the inclusion of sexual orientation as a protected characteristic under the MHRA. See, e.g., Joint Religious Legislative Coal., JRLC Position on Human Rights with Regard to Sexual Orientation (Mar. 4, 1993), J.A. 463–71; Statement from James D. Habiger, Exec. Dir., Minn. Catholic Conference (Mar. 1, 1993), J.A. 473–75; Task Force Report, J.A. 376–86 (excerpting endorsements from forty-seven religious denominations or institutions). To accommodate religious views, the legislature added a broad exemption to the MHRA for religious nonprofits. As originally enacted, the amendment provided that nothing within the MHRA

> prohibits any religious association, religious corporation, or religious society that is not organized for private profit, or any institution organized for educational purposes that is operated, supervised, or controlled by a religious association, religious corporation, or religious society that is not organized for private profit, from:

---

R.I. Gen. Laws Ann. § 11-24-2 (West 2001); Vt. Stat. Ann. tit. 9, § 4502(a) (West 2015); Wash. Rev. Code Ann. § 49.60.215 (West 2019); Wis. Stat. Ann. § 106.52(3)(a)(1) (West 2016). At least two other states interpret laws prohibiting sex discrimination as also prohibiting sexual-orientation discrimination. See *Interpretive Statement on Meaning of "Sex" in Elliott-Larsen Civil Rights Act*, Mich. C.R. Commission (May 21, 2018), https://www.michigan.gov/documents/mdcr/MCRC_Interpretive_Statement_on_Sex_05212018_625067_7.pdf; *Guidance on Discrimination on the Basis of Sex Under the Pennsylvania Human Relations Act*, Penn. Hum. Rel. Commission (Aug. 2, 2018), https://www.phrc.pa.gov/About-Us/Publications/Documents/General Publications/APPROVED Sex Discrimination Guidance PHRA.pdf.

(1) limiting admission to or giving preference to persons of the same religion or denomination; or

(2) in matters relating to sexual orientation, taking any action with respect to education, employment, housing and real property, or use of facilities. This clause shall not apply to secular business activities engaged in by the religious association, religious corporation, or religious society, the conduct of which is unrelated to the religious and educational purposes for which it is organized.

Act of April 2, 1993, ch. 22, sec. 6, 1993 Minn. Laws at 125–26 (now codified at Minn. Stat. § 363A.26). When Minnesota amended its laws in 2013 to authorize same-sex marriages, it added a third paragraph to the exception:

(3) taking any action with respect to the provision of goods, services, facilities, or accommodations directly related to the solemnization or celebration of a civil marriage that is in violation of its religious beliefs.

Act of May 14, 2013, ch. 74, sec. 1, 2013 Minn. Laws 1 (now codified at Minn. Stat. § 363A.26). The 1993 amendments also exempted from the Public Accommodations Provision

employees or volunteers of a nonpublic service organization whose primary function is providing occasional services to minors, such as youth sports organizations, scouting organizations, boys' or girls' clubs, programs providing friends, counselors, or role models for minors, youth theater, dance, music or artistic organizations, agricultural organizations for minors, and other youth organizations, with respect to qualifications based on sexual orientation.

-34-

Act of April 2, 1993, ch. 22, sec. 5, 1993 Minn. Laws at 125 (now codified at Minn. Stat. § 363A.24 subdiv. 1).

B

The Larsens have sincere views about marriage rooted in their deeply held religious beliefs. They are "Christians who base their beliefs on the Bible." Am. Compl. ¶ 21. In particular, the Larsens "disagree with the view and message that same-sex marriage is morally equivalent to the historic, biblically-orthodox definition of marriage as between one man and one woman." Id. ¶ 116. Their religious and philosophical objections to same-sex marriage are entitled to respect, and "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). "For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives." Lawrence, 539 U.S. at 571. The First Amendment undoubtedly protects the Larsens' ability to "advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." Obergefell, 135 S. Ct. at 2607.

But this case is not about the Larsens' rights as individual citizens to worship freely or to speak openly about their faith or political views. It is about their rights as owners of Telescope Media Group (TMG), a Minnesota for-profit corporation. TMG provides a variety of video and media production services to the public, including short films and commercials. TMG does not currently make wedding videos, but the Larsens want to expand TMG to include this service. The Larsens aver that they "desire to use their unique storytelling and promotional talents to convey messages that promote aspects of their sincerely-held religious beliefs." Am. Compl. ¶ 93. To that end, the Larsens want to offer wedding-video services, but they do not want to provide those services to same-sex couples.

-35-

The Larsens concede that, by offering wedding-video services to the general public, TMG qualifies as a place of public accommodation under the MHRA's definition. Id. ¶ 81. As a for-profit corporation, it falls outside the exemptions included in the law for religious and secular nonprofits. See Minn. Stat. §§ 363A.24 subdiv. 1, 363A.26. The Public Accommodations Provision therefore prohibits TMG from denying anyone the "full and equal enjoyment" of its services based on sexual orientation, id. § 363A.11 subdiv. 1(a)(1), and the Business Discrimination Provision prohibits it from discriminating in terms of a contract based on a person's sexual orientation unless it is because of a legitimate business purpose, id. § 363A.17(3). Minnesota has issued guidance stating that these provisions mean that "a business that provides wedding services . . . may not deny services to a same-sex couple based on their sexual orientation." Am. Compl. ¶ 61.

The Larsens also express a desire to create a website that includes the following disclaimer against providing services to same-sex weddings: "Because of TMG's owners' religious beliefs and expressive purposes, it cannot make films promoting any conception of marriage that contradicts its religious beliefs that marriage is between one man and one woman, including films celebrating same-sex marriages." Id. ¶ 158. They also intend to require every couple that uses their services to sign a contract that requires TMG to publicly promote the couple's wedding video on TMG's website and social media. Thus, if required to provide wedding-video services for all couples, the Larsens assert that their own contract would force them to promote a pro-same-sex-marriage viewpoint that they do not endorse.

The Larsens brought this lawsuit seeking to enjoin application of the MHRA as to TMG, thus providing them an exemption from the Public Accommodations Provision and Business Discrimination Provision. They assert causes of action under the First Amendment's protections for free speech, expressive association, and the free exercise of religion, as well as under the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

-36-

## II

Before addressing the Larsens' various claims, it is necessary to say a few words about the justiciability of their allegations. Both standing and ripeness are limitations on our judicial power "and must be considered even if not raised by the parties." Minn. Citizens Concerned for Life v. FEC, 113 F.3d 129, 131 n.5 (8th Cir. 1997); see 281 Care Comm. v. Arneson, 766 F.3d 774, 780 (8th Cir. 2014). "To decide ripeness, courts consider: '(1) the hardship to the plaintiff caused by delayed review; (2) the extent to which judicial intervention would interfere with administrative action; and (3) whether the court would benefit from further factual development.'" Missourians for Fiscal Accountability v. Klahr, 830 F.3d 789, 796–97 (8th Cir. 2016) (quoting Nat'l Right to Life Political Action Comm. v. Connor, 323 F.3d 684, 692–93 (8th Cir. 2003)). "The touchstone of a ripeness inquiry is whether the harm asserted has matured enough to warrant judicial intervention." Parrish v. Dayton, 761 F.3d 873, 875 (8th Cir. 2014) (cleaned up). Similarly, to have standing to bring a pre-enforcement First Amendment challenge to a statute that provides criminal penalties, there must be a "a credible threat of present or future prosecution." Minn. Citizens, 113 F.3d at 131 (quoting N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996)).

Whether the Larsens' claims are justiciable at this juncture hinges on whether their intended course of conduct is arguably proscribed by the MHRA. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 162 (2014). To violate either of the MHRA provisions at issue here, a business must do two things. First, it must treat a person differently than it would treat someone else—either by denying the person the "full and equal enjoyment" of its goods and services or by engaging in one of several forms of business discrimination. Second, that difference in treatment must be "because of" one of the protected characteristics enumerated in the MHRA. As applied to the Larsens and TMG, whether their business model violates this test depends on exactly what "service" they generally provide to the public and whether they are denying that service because of a protected characteristic. For example, a

bakery that does not make cakes does not violate the MHRA by declining to bake a wedding cake for a same-sex couple, because it is not treating that couple differently than it would anyone else.

Because we are at the pleading stage, our only guidance about how to define TMG's service comes from the complaint. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))). TMG currently offers "a wide variety of video and media production related services to the public," but it does not offer wedding-video services. Am. Compl. ¶ 80. So, if a same-sex couple approached the Larsens today seeking a wedding video, the Larsens' refusal to serve them would not violate the MHRA because the Larsens do not currently make that service available to the public. But the complaint alleges that the Larsens want to expand TMG to offer "wedding-related services," id. ¶ 139, specifically the creation of "wedding videos," id. ¶¶ 136, 138, 254. A couple seeking this service would pay the Larsens to film their wedding and produce a video of the event. Id. ¶¶ 131–33, 147. The Larsens are "the master[s] of [their] own complaint," so we must accept that this is the service that they want TMG to provide. In re SuperValu, Inc., 925 F.3d 955, 965 (8th Cir. 2019).

With this understanding, there is little doubt that offering to film weddings of heterosexual couples but refusing to film weddings of homosexual couples—purely because they are homosexual—would violate both the Public Accommodations Provision and the Business Discrimination Provision of the MHRA. The Larsens concede as much in their complaint, alleging that they want to expand TMG to offer wedding-video services to only opposite-sex couples but that "the MHRA prohibits them from doing so." Am. Compl. ¶ 160.

The court's opinion attempts to cast some doubt about whether the plain text of the MHRA would require TMG to provide wedding-video services for same-sex

-38-

weddings if it offers those services to heterosexual couples. The implication is that the MHRA would only proscribe the Larsens' conduct because "Minnesota reads" the law that way. Supra at 4. For their part, the Larsens argue that they "would not create a film celebrating same-sex marriage no matter who requested it." This argument appears to be premised on the idea that the service that TMG would provide is not "wedding videos"—which is how it is phrased in the complaint—but "opposite-sex wedding videos." So long as the Larsens are willing to offer *that* service to anyone, the argument goes, they do not violate the law.

This argument fails. Under the MHRA, a business cannot define its services in such a way as to incorporate a discriminatory characteristic. The Larsens cannot define their service as "opposite-sex wedding videos" any more than a hotel can recast its services as "whites-only lodgings." That is because the MHRA does not merely prohibit TMG from treating customers differently based on the *customer's* sexual orientation. It prohibits "deny[ing] *any person* the full and equal enjoyment" of its services "because of . . . sexual orientation," Minn. Stat. § 363A.11 subdiv. 1(a)(1) (emphasis added), or discriminating in business "because of *a person's* . . . sexual orientation," id. § 363A.17(3) (emphasis added). In a nutshell, if the reason for treating a customer differently is because of sexual orientation, race, or another protected characteristic, that differential treatment is prohibited. See Abdull v. Lovaas Inst. for Early Intervention Midwest, 819 F.3d 430, 433–34 (8th Cir. 2016) (reading Minn. Stat. § 363A.11 to require the plaintiff to demonstrate that the protected characteristic "'more likely than not motivated' the defendant").

To conclude otherwise would redefine discrimination to no longer encompass a host of actions universally understood to be discriminatory. If a white store owner refuses to sell goods to a white patron because the patron entered the store accompanied by someone of another race, that is still discrimination "because of" race. See Bob Jones Univ. v. United States, 461 U.S. 574, 605 (1983) ("[D]ecisions of this Court firmly establish that discrimination on the basis of racial affiliation and association is a form of racial discrimination."). If a male basketball coach is

-39-

retaliated against for complaining about unequal funding for the girls' basketball team, that retaliation is "on the basis of sex." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 176–77 (2005). Likewise, regardless of who asks TMG to create the wedding video, if the Larsens refuse to provide the service because of the sexual orientation of the video's subjects, that is discrimination "because of" sexual orientation.

Moreover, it is well established that some protected characteristics are so intertwined with particular conduct that discrimination against the conduct becomes discrimination against the protected class. Christian Legal Soc'y Chapter v. Martinez, 561 U.S. 661, 688–89 (2010); see also Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). The Supreme Court has repeatedly connected certain conduct with sexual orientation as a protected characteristic. Christian Legal, 561 U.S. at 689; see Lawrence, 539 U.S. at 575 ("When homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination both in the public and in the private spheres." (emphases added)); Romer v. Evans, 517 U.S. 620, 624 (1996) (characterizing a Colorado constitutional amendment prohibiting antidiscrimination laws from including protections for "homosexual, lesbian or bisexual orientation, *conduct, practices or relationships*" as discriminating against homosexual persons as a class (emphasis added)). Same-sex marriage has been described as a fundamental expression of an individual's sexual orientation. See Obergefell, 135 S. Ct. at 2604 (holding that laws prohibiting same-sex marriage "impos[e] [a] disability on gays and lesbians"); United States v. Windsor, 570 U.S. 744, 775 (2013) ("DOMA singles out a *class of persons* deemed by a State entitled to recognition and protection to enhance their own liberty." (emphasis added)).

Accordingly, intentionally refusing to provide services for a wedding because it involves a same-sex couple *is* prohibited sexual-orientation discrimination under the MHRA. The Larsens have made clear that they would refuse service to *any*

same-sex wedding and that the only reason that they would do so would be "because of" the sexual orientation of the couple involved. That conduct is clearly prohibited by the MHRA, as the Larsens acknowledge in their complaint and as the court recognizes in its rejection of their vagueness challenge. See supra at 26 ("The allegations in the complaint . . . doom the Larsens' argument . . . because they insist that 'the MHRA prohibits them from [creating only opposite-sex-wedding videos]' . . . ." (alteration in original)).

The MHRA also requires that the services offered to same-sex couples be the same as those offered to opposite-sex couples. The Business Discrimination Provision prohibits a business from "discriminat[ing] in the basic terms, conditions, or performance of the contract" because of a person's sexual orientation or other protected characteristic. Minn. Stat. § 363A.17(3). Thus, TMG cannot avoid violating the MHRA by providing other types of non-wedding services to gay and lesbian clients, nor can it provide services to same-sex couples that are inferior to those that it provides to heterosexual couples. Courts have long rejected the notion that the provision of "separate but equal" services is anything but discrimination by another name. Brown v. Bd. of Ed., 347 U.S. 483, 495 (1954); see also Katzenbach v. McClung, 379 U.S. 294, 296–99 (1964) (concluding that a restaurant that provided "a take-out service for Negroes" but "refused to serve Negroes in its dining accommodations" violated Title II's public accommodations provision). Otherwise, public accommodations laws would be completely ineffective at "vindicat[ing] the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 250 (1964).

I recognize that the complaint alleges that the *reason* for the Larsens' differential treatment of same-sex couples is not because of prejudice against homosexuals, but because they disagree with the message that a video of a same-sex marriage would convey. But that does not make their intended conduct

-41-

nondiscriminatory under the law. They want TMG to offer different services to customers based on sexual orientation, running afoul of the MHRA. Whatever the Larsens' motivations, the premise of this lawsuit is that TMG would violate the MHRA if it engages in the conduct described in the complaint.

In its First Amendment analysis, the court focuses on a question that is not before us today: whether the MHRA could be applied to require a business to express a specific message to which it objects, such as writing a racial slur on a cake or tattooing a religious message on someone's skin. It is not at all clear that a business violates the MHRA by refusing to express such a message if that is not a service that it would provide to a different type of customer. See Masterpiece Cakeshop, 138 S. Ct. at 1733 (Kagan, J., concurring) (suggesting that a baker who refuses to inscribe a cake with a message that he "would not have made for any customer" does not engage in unlawful discrimination based on a protected characteristic). At oral argument, Minnesota represented that it would not view such a denial of service as violating the MHRA because it is not discrimination "because of" protected status. Oral Arg. at 31:15–31:42. If such a case were to arise, further factual development would be necessary to understand the exact scope of the business's services and the precise nature of the refusal of service. See Masterpiece Cakeshop, 138 S. Ct. at 1723 ("If a baker refused to design a special cake with words or images celebrating the marriage—for instance, a cake showing words with religious meaning—that might be different from a refusal to sell any cake at all. In defining whether a baker's creation can be protected, these details might make a difference."). Such factual development could only occur in the context of a live controversy in which Minnesota was actually attempting to enforce the MHRA. We need not decide whether application of the MHRA to such a circumstance would comport with the Constitution because the Larsens concede that they want to deny their services to *all* same-sex weddings regardless of what particular messages the same-sex couples want to express in their videos.

Because the Larsens aver that they want to offer wedding-video services only to couples of one sexual orientation and not others, they have standing, and this case is ripe for judicial decision. Accepting the complaint's allegations as true, no "further factual development" is needed to determine whether the Larsens could be prosecuted for violating the MHRA. Iowa League of Cities v. EPA, 711 F.3d 844, 867 (8th Cir. 2013) (quoting Pub. Water Supply Dist. No. 10 v. City of Peculiar, 345 F.3d 570, 573 (8th Cir. 2003)). The only issue before us is a question of law: whether the Constitution compels Minnesota to exempt TMG from the MHRA's provisions.

III

It is well established that videos are a form of speech protected by the First Amendment. See Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 502 (1952). But the First Amendment's right of free speech is "not unlimited." District of Columbia v. Heller, 554 U.S. 570, 595 (2008); see Roberts v. U.S. Jaycees, 468 U.S. 609, 623 (1984); Joseph Burstyn, 343 U.S. at 502. "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." Sorrell v. IMS Health Inc., 564 U.S. 552, 567 (2011). Such restrictions on speech are valid, "provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (cleaned up).

A

Courts draw a clear line "between content-based and content-neutral regulations of speech." Nat'l Inst. of Family & Life Advocates v. Becerra (NIFLA), 138 S. Ct. 2361, 2371 (2018). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015). A

content-based law "'on its face' draws distinctions based on the message a speaker conveys," id. (quoting Sorrell, 564 U.S. at 566), or has the purpose of suppressing speech "because of disagreement with the message it conveys," Sorrell, 564 U.S. at 566 (quoting Ward, 491 U.S. at 791). Regulations that "target speech based on its communicative content . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed, 135 S. Ct. at 2226. Similarly, when the government compels an individual to engage in speech the individual otherwise would find objectionable, this ordinarily constitutes a content-based regulation triggering strict scrutiny. NIFLA, 138 S. Ct. at 2371; see also Janus v. AFSCME, 138 S. Ct. 2448, 2463–64 (2018).

By contrast, a law is content neutral if it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791. "Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" Id. (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)). A content-neutral regulation is subject to intermediate scrutiny, meaning it must merely be "narrowly tailored to serve a significant governmental interest." Packingham v. North Carolina, 137 S. Ct. 1730, 1736 (2017) (quoting McCullen v. Coakley, 134 S. Ct. 2518, 2534 (2014)). In general, statutes "directed at commerce or conduct" do not violate the First Amendment, even if they impose "incidental burdens" on speech or inherently expressive conduct. Sorrell, 564 U.S. at 567.

1

The MHRA neither compels speech nor targets speech based on its content. In fact, the law says nothing about speech at all. The Public Accommodations Provision prohibits "deny[ing]" individuals the full and equal enjoyment of goods and services, Minn. Stat. § 363A.11 subdiv. 1(a)(1); the Business Accommodation

-44-

Provision speaks of "refus[ing] to do business with" or "discriminat[ing]" against persons based on a protected characteristic, id. § 363A.17(3). Neither provision "on its face" regulates speech or draws distinctions based on a speaker's message. Reed, 135 S. Ct. at 2227; see supra at 25 ("The MHRA does not classify anyone based on their views about marriage."). Instead, the law "regulates conduct, not speech." Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 60 (2006). "It affects what [businesses] must *do*—afford equal [treatment] to [customers]—not what they may or may not *say*." Id.

The Supreme Court has repeatedly reaffirmed the view that laws targeting discrimination "do[] not, on [their] face, target speech or discriminate on the basis of its content." Hurley, 515 U.S. at 572. Indeed, it has done so specifically regarding the MHRA's Public Accommodations Provision. More than thirty years ago, the Supreme Court rejected an expressive association claim brought by the U.S. Jaycees nonprofit, which sought to exclude women members but was prevented from doing so by operation of the MHRA. The Court held that, "[o]n its face, the Minnesota Act does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." Roberts, 468 U.S. at 623. There is also no evidence that Minnesota enacted the MHRA to support or suppress any particular message; the MHRA's goals are "unrelated to the suppression of expression." Id. at 624. Applying Roberts, the MHRA is a content-neutral statute and subject to intermediate scrutiny.

2

Dismissing Roberts, the court today concludes that the MHRA operates as a content-based regulation of speech. By the court's logic, because the MHRA prohibits the Larsens from operating their public accommodation to provide only services to opposite-sex couples, it "compel[s] them to talk about a topic they would

rather avoid—same-sex marriages."[7]  Supra at 12–13.  The court attempts to analogize the MHRA to the statute challenged in Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 244 (1974), a law that required newspapers to print a free reply to any candidate "assailed" by the paper.  But that analogy fails from the start.  That a law regulating the *content* of a *newspaper* was deemed a content-based regulation of speech has no bearing on whether a law regulating *discrimination* in places of *public accommodation* also so qualifies.

The court's opinion relies extensively on Hurley, which dealt with application of Massachusetts's public accommodations law to a privately organized parade.  But the court's discussion of Hurley omits a few crucial details.  In Hurley, the Supreme Court made clear that a public accommodations law "does not, on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds." Hurley, 515 U.S. at 572.  Citing Roberts, the Court also stated that public accommodations laws "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." Id.  Of course, if public accommodations laws were content-based regulations of speech, they would not "as a general matter" be constitutional.  Instead, they would be "presumptively unconstitutional." Reed, 135 S. Ct. at 2226.

The Supreme Court ultimately concluded that applying the public accommodations law to the parade in Hurley did not withstand constitutional

---

[7]The idea that the Larsens "would rather avoid" talking about same-sex marriage is belied by their own allegations.  The complaint asserts that the Larsens want to expand TMG into the wedding-video business precisely to "affect the cultural narrative regarding marriage."  Am. Compl. ¶ 137.  To that end, they desire to create a website and promotional materials that affirmatively state that TMG will not make films celebrating same-sex marriages.  Id. ¶¶ 157–58.

scrutiny. But it did so because Massachusetts was attempting to apply the law "in a peculiar way." 515 U.S. at 572. A parade is, by definition, an expressive association. Id. at 568. That a parade's participants "are making some sort of collective point, not just to each other but to bystanders along the way," is what distinguishes a parade from a mere stroll down the street. Id. The issue in Hurley was not whether gay and lesbian individuals could march in the parade—they were welcome to do so—but whether a particular gay and lesbian organization would be permitted to march in the parade with a banner that organizers felt contravened the parade's message. Applying the statute to require the parade sponsors to allow the banner made a public accommodation out of "the sponsors' speech itself," id. at 573, and treated the sponsors' exclusion of the message as discrimination against a class. By applying the law in a way that "alter[ed] the expressive content of their parade," Massachusetts violated the parade sponsors' autonomy as speakers. Id. at 572–73.

Hurley thus stands for the proposition that a facially neutral law may be subject to strict scrutiny if it is *applied* in a way that materially burdens the speaker's "autonomy to choose the content of *his own* message." Id. at 573 (emphasis added). In Boy Scouts of America v. Dale, the Supreme Court similarly applied strict scrutiny to a facially neutral New Jersey antidiscrimination statute that required the Boy Scouts to retain a gay scoutmaster because doing so "would significantly burden the organization's right to oppose or disfavor homosexual conduct," 530 U.S. 640, 659 (2000), which was one of "the ideas that the organization sought to express," id. at 657. In cases where the law's application did not significantly impair the ability of the speaker to convey his chosen message—such as when the expressive association's basic goals are unrelated to the desired exclusion—the Court has found no First Amendment violation. For example, in Roberts, the Supreme Court declined to hold the MHRA invalid because "the Jaycees . . . failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association." 468 U.S. at 626; accord Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 548 (1987) ("[T]he evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any significant way

the existing members' ability to carry out their various purposes."). In each case finding a compelled-speech violation, the violation "resulted from the fact that the complaining speaker's *own message* was affected by the speech it was forced to accommodate." Rumsfeld, 547 U.S. at 63 (emphasis added).

Here, taking the complaint as true, the Larsens cannot show that viewers of TMG's wedding videos would be likely to understand them to be expressions of *the Larsens'* "particularized message" about marriage. Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence v. Washington, 418 U.S. 405, 411 (1974) (per curiam)). The complaint alleges that the Larsens want to be for-profit wedding videographers, not independent filmmakers. Although an artistic endeavor, wedding videos—like other expressive wedding services—do not primarily reflect the views of the videographer, but of the couple getting married. See Masterpiece Cakeshop, 138 S. Ct. at 1750 (Ginsburg, J., dissenting) ("When a couple contacts a bakery for a wedding cake, the product they are seeking is a cake celebrating *their* wedding—not a cake celebrating heterosexual weddings or same-sex weddings . . . ."). "[TMG] sells its expressive services to the public. It may be that [TMG] expresses its clients' messages in its [videos], but only because it is hired to do so." Elane Photography, LLC v. Willock, 309 P.3d 53, 66 (N.M. 2013).

The Larsens acknowledge as much in their complaint: "When an engaged couple asks the Larsens to help them celebrate their marriage, the Larsens want to tell a story of *their* love and commitment . . . ." Am. Compl. ¶ 131 (emphasis added). Although the Larsens may exercise editorial control over TMG's services, it is still ultimately the couple's story that is being told, not that of the Larsens. "[R]easonable observers would not perceive [the Larsens'] provision of . . . services for a same-sex wedding ceremony as an endorsement of same-sex marriage." Gifford v. McCarthy, 137 A.D.3d 30, 42 (N.Y. App. Div. 2016). By selling its services to the public, TMG "functions, in essence, as a conduit for the speech of others," necessarily subordinating the Larsens' own messages to those of their customers. Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 629 (1994). For better

-48-

or worse, "[o]nce [TMG] enters the marketplace of commerce . . . it loses the complete control over its [speech] that it would otherwise enjoy if it confined its affairs to the marketplace of ideas." Roberts, 468 U.S. at 636 (O'Connor, J., concurring). Whereas the application of Massachusetts's law in Hurley improperly transformed the parade sponsors' speech into a public accommodation, here it is the Larsens who are affirmatively declaring their speech to be a public accommodation by selling their videography services on the open market.

Admittedly, the Larsens take great pains to portray themselves more like independent artists telling their own story than messengers acting on behalf of others. At oral argument, their counsel compared them to "Steven Spielberg, edit[ing] the film[s] to express messages" consistent with their personal and religious views. Oral Arg. at 0:00–1:05. But Steven Spielberg is not a public accommodation; he does not make his filmmaking services generally "available to the public." Minn. Stat. § 363A.03 subdiv. 34. He is thus free to use his talents as he pleases without regard for laws like the MHRA. If the Larsens truly were artists speaking their own message, then TMG similarly would not qualify as a place of public accommodation and this entire lawsuit would be unnecessary.

Therefore, just because the Larsens want to sell services that are in some manner "expressive" does not mean that Minnesota's content-neutral regulation of those services suddenly becomes content based. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949). After all, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989). Conduct does not become protected speech simply because "the person engaging in the conduct intends

-49-

thereby to express an idea." United States v. O'Brien, 391 U.S. 367, 376 (1968). Likewise, a regulation of conduct does not become a regulation of content just because there are "incidental" effects on expression. Sorrell, 564 U.S. at 567. That is true even if one of the incidental effects of regulating conduct is the compulsion of speech. Rumsfeld, 547 U.S. at 62. Laws with such incidental effects are "simply not the same as" laws that require individuals to advocate a particular, government-sanctioned message, such as "forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die.'" Id. Laws with merely incidental effects on expression are subject to intermediate scrutiny. See O'Brien, 391 U.S. at 376–77.

The court's opinion warns, supra at 10, that applying intermediate scrutiny to the MHRA would invite government regulation of "wide swaths of protected speech." Hardly. A law telling an independent artist what pictures to paint or a newspaper what articles to publish would still be subject to strict scrutiny. See Rumsfeld, 547 U.S. at 62. But an independent artist who chooses what to paint and then sells the finished product is not the same as a boardwalk cartoonist who offers his services to any passing beachgoer. If the cartoonist refuses to paint the portrait of an interracial couple or a woman in a hijab, the state's regulation of that expressive *conduct* via a content-neutral statute does not trigger strict scrutiny. O'Brien, 391 U.S. at 376–77; see Roberts, 468 U.S. at 634 (O'Connor, J., concurring) ("The Constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State."). The Larsens are free to use their talents to create independent films about marriage that express any message they choose, and they are free to sell those films to the public. But if they offer wedding-video *services* to the public, they must abide by public accommodations laws like the MHRA.

Because the MHRA is content neutral and is not being applied in a manner that substantially burdens the Larsens' right to express their own message, it is subject to intermediate scrutiny.

-50-

# B

Although intermediate scrutiny is the applicable standard, the MHRA would survive even strict scrutiny. To satisfy intermediate scrutiny, the MHRA must be narrowly tailored to serve governmental interests that are merely "significant," Packingham, 137 S. Ct. at 1736, as opposed to "compelling," Reed, 135 S. Ct. at 2226. Even if the MHRA is held to the higher standard of strict scrutiny, the Supreme Court has already told us that it is constitutional.

In general, public accommodations laws further compelling state interests of eradicating discrimination and ensuring residents have equal access to publicly available goods and services. Roberts, 468 U.S. at 623; see also Boy Scouts of Am., 530 U.S. at 657; Bd. of Dirs. of Rotary Int'l, 481 U.S. at 549. "[A]cts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent[,] . . . [and] such practices are entitled to no constitutional protection." Roberts, 468 U.S. at 628. Specifically, in Roberts, the Supreme Court held that the MHRA serves "Minnesota's compelling interest in eradicating discrimination against its female citizens," id. at 623, which it characterized as a "compelling state interest[] of the highest order," id. at 624.

If eradicating discrimination based on race or sex is a compelling state interest, then so is Minnesota's interest in eradicating discrimination based on sexual orientation. Minnesota's decision to extend the MHRA's protections to cover sexual orientation was driven by considerable evidence of discrimination against the state's gays and lesbians. Task Force Report, J.A. 332. The task force that precipitated the law's amendment specifically identified the need to protect against sexual-orientation discrimination in places of public accommodation due to evidence that gays and lesbians were being denied access to goods and services. Id. It also noted that discrimination appeared more prevalent in the state's rural areas. Id., J.A. 333.

The Larsens argue that no compelling interest is served by applying the MHRA to TMG because plenty of other businesses are happy to provide wedding-video services to same-sex couples. The argument that victims of discrimination are free to go elsewhere carries little force. Antidiscrimination laws like Title II and the MHRA were not passed to ensure that members of historically discriminated groups had access to *some* places of public accommodation. They were passed to guarantee equal access to *all* goods and services otherwise available to the public. "Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his race or color." Heart of Atlanta Motel, 379 U.S. at 292 (Goldberg, J., concurring) (quoting S. Rep. No. 88-872, at 16 (1964), as reprinted in 1964 U.S.C.C.A.N. 2355, 2370). Even accepting the premise of the Larsens' argument, applying the MHRA to wedding-related services across Minnesota would still further the state's compelling interest in eradicating sexual-orientation discrimination in Minnesota's rural areas. Although many alternative wedding venues and services may be available in larger cities, the same may not be true in small towns. The pain of discrimination is undoubtedly more severe when it comes from the only videography service in the area.

The court's opinion asserts that while regulating discriminatory conduct may be a compelling state interest, regulating the content of the Larsens' speech is not. Supra at 14–16. But the MHRA regulates only discriminatory conduct; the sole reason that the Larsens' expression is even tangentially affected by the law is because the Larsens make their speech available as a service for other members of the public to hire. When the government requires those services to be available to everyone, it is not forcing them to speak. Likewise, it is not an abridgment of the Larsens' freedom of speech to prohibit them from posting messages on TMG's website stating that they do not serve same-sex weddings. Rumsfeld, 547 U.S. at 62 ("Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign

-52-

reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.").

The MHRA is also narrowly tailored to serve the state's interest in eradicating discrimination. Again, it targets only conduct, not speech. The MHRA "therefore 'responds precisely to the substantive problem which legitimately concerns' the State and abridges no more speech or associational freedom than is necessary to accomplish that purpose." Roberts, 468 U.S. at 629 (quoting Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 810 (1984)). Thus, the MHRA survives any level of scrutiny, and the district court properly dismissed the Larsens' free speech claim.

IV

The Larsens' free exercise claim fares no better than their free speech claim. The First Amendment, as applied to the states through the Fourteenth, prevents states from passing laws that prohibit the free exercise of religion. Cantwell v. Connecticut, 310 U.S. 296, 303–04 (1940). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 877 (1990). Accordingly, neither the federal government nor the states may dictate religious beliefs. Id.

But although the "freedom to believe" is absolute, the "freedom to act" is not. Cantwell, 310 U.S. at 303–04. "Conduct remains subject to regulation for the protection of society." Id. at 304. "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." Smith, 494 U.S. at 879 (cleaned up). "[I]f prohibiting the exercise of religion . . . is not the object of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." Id. at 878. "When followers of a particular sect enter into

-53-

commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." United States v. Lee, 455 U.S. 252, 261 (1982).

Just as the MHRA does not target speech, neither does it target religion. The Public Accommodations Provision and the Business Discrimination Provision make no facial reference to religious practice, see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993), and do not "single out the religious for disfavored treatment," Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012, 2020 (2017). Likewise, the object of the MHRA is not "to infringe upon or restrict practices because of their religious motivation," Church of the Lukumi Babalu Aye, 508 U.S. at 533, but to combat discrimination, regardless of the motivation. Indeed, the law incorporates carefully-crafted exceptions for places of religious worship and secular nonprofits. The MHRA therefore qualifies as "a neutral, generally applicable regulatory law" that does not trigger heightened scrutiny. Smith, 494 U.S. at 880; see Masterpiece Cakeshop, 138 S. Ct. at 1727.

The Larsens argue that the MHRA is not neutral because the Business Discrimination Provision's "legitimate business purpose" exception is vague and allows the state to arbitrarily provide individualized exemptions to non-religious businesses. This argument fails. In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the Supreme Court explained that a difference in treatment based on a "legitimate, nondiscriminatory reason" is not prohibited discrimination at all. Courts are familiar with this standard, and there is no indication that it has proved difficult to administer. The complaint contains no plausible allegation that Minnesota has actually applied this exception in an unequal fashion to target religious individuals.

The Larsens also argue that the MHRA should be subject to heightened scrutiny because, even if facially neutral, the law "substantially burdens" their

-54-

religious exercise. But the Supreme Court rejected that argument in Smith, holding that "an across-the-board criminal prohibition on a particular form of conduct" need not be justified by a compelling government interest just because it applies in some cases to religious conduct. 494 U.S. at 884–85. Regardless, courts have consistently rejected the argument that compliance with antidiscrimination statutes imposes a substantial burden on religion, see, e.g., Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 402 n.5 (1968) (dismissing as "patently frivolous" the argument that Title II of the Civil Rights Act of 1964 violated respondents' right to free exercise), and have repeatedly held that public accommodations laws satisfy strict scrutiny, see Roberts, 468 U.S. at 623.

The court today allows the Larsens' free exercise claim to move forward, on the theory that it is intertwined with their free speech claim. This theory derives from dicta in Smith that suggested that a neutral, generally applicable law may be subject to heightened scrutiny under the Free Exercise Clause when the claim operates "in conjunction with other constitutional protections, such as freedom of speech and of the press," thereby creating a "hybrid situation." 494 U.S. at 881–82. Contrary to the court's assertion today, supra at 23, we have never endorsed the hybrid-rights doctrine, nor have we ever articulated a framework for analyzing such claims. In a single sentence of Cornerstone Bible Church v. City of Hastings, we noted the *possibility* that such a claim could exist based on Smith's dicta but remanded to the district court to "consider" whether such a claim was viable in the first instance. 948 F.2d 464, 473 (8th Cir. 1991). But even if the court is right that this was a "holding," we need not resolve the viability of the theory in this case because the Larsens do not have a valid free speech claim.

None of the Larsens' remaining claims are viable, as the court explains, supra at 24–27. Accordingly, I would affirm the judgment of the district court dismissing their complaint for failure to state a claim upon which relief can be granted.

## V

By ruling that, under the Larsens' allegations, the MHRA is subject to and fails strict scrutiny, the court carves out an exception of staggering breadth. Under its logic, any time that a state's regulation of discriminatory conduct requires a person to provide services that "express" something that they dislike, the law is invalid. That ruling cannot be easily limited. Innumerable companies and individuals sell products and services that are in some shape or form expressive. The court provides no way to distinguish whether its holding applies to all, or only some, of those industries. It might be easy to conclude that some services are sufficiently similar to videography as to warrant the same treatment as the Larsens get today—photography, for example, or other forms of visual art. But what about bakers, fashion designers, florists, graphic designers, tattoo artists, calligraphers, jewelers, chefs, tailors, or musicians? Are all of those businesses allowed to refuse service to gays and lesbians whenever doing so would conflict with the business owner's personal religious or philosophical beliefs? What about more traditional public accommodations, like hotels? Can an inn-keeper deny a same-sex couple access to the honeymoon suite because handing over the keys would "express" an endorsement of their marriage? See Task Force Report, J.A. 332 (recounting precisely this form of discrimination). To these questions the court gives us no answers. Today's opinion invites a flood of litigation that will require courts to grapple with difficult questions about whether this or that service is sufficiently creative or expressive to merit a similar exemption.

The court's opinion is similarly not limited based on the fact that sexual orientation happens to be the protected characteristic at issue in this case. Its logic would apply with equal force to any business that desires to treat customers differently based on any protected characteristic, including sex, race, religion, or disability. And what may start in the wedding business—"we don't do interracial weddings," "we don't film Jewish ceremonies," and so on—likely will not end there. Nothing stops a business owner from using today's decision to justify new forms of

-56-

discrimination tomorrow. In this country's long and difficult journey to combat all forms of discrimination, the court's ruling represents a major step backward.

It is unremarkable that the Constitution and the laws of the various states "can, and in some instances must," protect same-sex couples in the exercise of their civil rights. Masterpiece Cakeshop, 138 S. Ct. at 1727. Minnesota has chosen to do so through the MHRA's Public Accommodations and Business Discrimination Provisions. Like all antidiscrimination laws, the MHRA targets conduct, not speech or ideas. The Supreme Court has already held that the MHRA is constitutional, in the process rejecting many of the same arguments that the court adopts today. Just recently, it reaffirmed that, although "religious and philosophical objections [to same-sex marriage] are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." Id. The Supreme Court is free to revise or overturn its precedents; we are not. See MKB Mgmt. Corp. v. Stenehjem, 795 F.3d 768, 772 (8th Cir. 2015). Rather than disturb bedrock principles of law, I would affirm the district court's order in full.

_____